Filed/Docketed
Apr 05, 2011

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE:<br><br>**ROBERT LEE GIBSON,**<br>a/k/a Bob Gibson,<br><br>    Debtor. | Case No. 09-12646-M<br>Chapter 7 |
| **ERIC EDWARDS and SHAYLA EDWARDS, individually and as parents and next friend of Nathan Edwards, a minor,**<br><br>    Plaintiffs,<br><br>v.<br><br>**ROBERT LEE GIBSON,**<br><br>    Defendant. | Adv. No. 09-01127-M |

**MEMORANDUM OPINION**

Objections to a debtor's discharge often focus upon two areas: transfers and disclosure. This is such a case. Here, the objecting creditors claim that the debtor conveyed property with the intent to hinder, delay, or defraud his creditors and failed to disclose the existence of valuable assets in his schedules. The debtor claims that the transfer was not his idea and caused no harm, and that the assets at issue, although undisclosed at the inception of the case, are now known to the trustee. The following findings of fact and conclusions of law are made pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52.

**Jurisdiction**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.A. §

1334(b).[1]   Reference to the Court of the underlying bankruptcy case is proper pursuant to 28 U.S.C.A. § 157(a).  Proceedings to determine whether a debtor is entitled to a discharge constitute core proceedings under 28 U.S.C.A. § 157(b)(2)(J).

**Burden of Proof**

A party seeking to deny a debtor's discharge pursuant to 11 U.S.C. § 727(a)(2) and (4) must prove each statutory element by a preponderance of the evidence.[2]  Once a *prima facie* case for denying the debtor's discharge under § 727 has been established, the burden of going forward shifts to the debtor.[3]  The ultimate burden, however, remains with the party seeking denial of the discharge.[4]  In order to further the policy of providing a debtor with a "fresh start," "the Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor."[5]  Bankruptcy courts may, in the interest of justice, "allow the entry of a discharge even if grounds for its denial are found."[6]

---

[1] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq*.

[2] *See* Fed. R. Bankr. P. 4005; *First Nat'l Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156, 1157 (10th Cir. 1991); *cf. Grogan v. Garner*, 498 U.S. 279 (1991).

[3] *See Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619 (11th Cir. 1984); *Everspring Enters., Inc. v. Wang (In re Wang),* 247 B.R. 211, 214 (Bankr. E.D. Tex. 2000).

[4] *See First Union Nat'l Bank v. Golob (In re Golob),* 252 B.R. 69, 75 (Bankr. E.D. Va. 2000) (citing *Farouki v. Emirates Bank Int'l, Ltd.,* 14 F.3d 244, 249 (4th Cir. 1994)).

[5] *Gullickson v. Brown*, 108 F.3d 1290, 1292 (10th Cir. 1997).  *See also In re Juzwiak,* 89 F.3d 424, 427 (7th Cir. 1996).

[6] *Crane v. Morris (In re Morris)*, 302 B.R. 728, 737 (Bankr. N. D. Okla. 2003) (citing, among other cases, *Union Planters Bank, N.A. v. Conners*, 283 F.3d 896, 901 (7th Cir. 2002)).

**Findings of Fact**

Robert Lee Gibson ("Mr. Gibson" or "Debtor") is an individual who lives on a ten acre tract of real estate located in Glenpool, Oklahoma (the "Real Property") with his wife, Barbara Jean Gibson ("Mrs. Gibson").[7] At all times from January 18, 1995, through March 19, 2009, Mr. Gibson and Mrs. Gibson held title to the Real Property as joint tenants. On March 19, 2009, Mr. Gibson transferred all of his right, title, and interest in the Real Property to Mrs. Gibson by virtue of a quitclaim deed (the "Quitclaim Deed").[8] The Quitclaim Deed was duly recorded in the office of the Tulsa County Clerk on March 19, 2009. Mr. Gibson received no consideration from his wife in exchange for the Quitclaim Deed. After he executed the Quitclaim Deed, Mr. Gibson continued to reside upon the Real Property and conduct his business operations at that location.

In 2002, Mr. Gibson was the sole officer, director, and shareholder of B&B Custom Homes ("B&B"), an Oklahoma corporation. In May of 2002, B&B entered into a contract to build a home (the "Webster Residence") for Mark and Tami Webster (the "Websters"). After the Webster Residence was completed, disputes arose between the Websters, B&B, and Mr. Gibson regarding the quality of construction. The dispute was taken to arbitration (the "Webster Arbitration"). B&B and Mr. Gibson were represented in the Webster Arbitration by Fred Stoops ("Stoops"), an attorney licensed to practice law in Oklahoma. On November 20, 2008, the arbitrator filed his findings and conclusions, stating that "[t]he Websters are entitled to damages from B&B in the amount of $192,800."[9] On March 12, 2009, the arbitrator entered an order overruling a request by Mr. Gibson

---

[7] The Real Property has a mailing address of Jenks, Oklahoma, but is located within the city limits of Glenpool.

[8] *Plaintiffs' Ex. 14*.

[9] *Plaintiffs' Ex. 16* at 5.

to reconsider the award of damages "against him individually."[10]  One week later, Mr. Gibson transferred his interest in the Real Property to Mrs. Gibson.  On June 2, 2009, the award of the arbitrator against Mr. Gibson was reduced to judgment.[11]

When questioned at trial as to why he executed the Quitclaim Deed, Mr. Gibson claimed that he did so solely upon the advice of his counsel at the time, Eugene Hough ("Hough"), an attorney duly licensed to practice law in the state of Oklahoma.  Mr. Gibson testified that he received this advice from Hough during a meeting at Hough's office.  At this meeting, Hough and Mr. Gibson were discussing the bankruptcy options available to Mr. Gibson.  Mr. Gibson stated that he questioned Hough no less than three times as to whether execution of the Quitclaim Deed was "legal."  According to Mr. Gibson, Hough became agitated and read a portion of an Oklahoma statute out loud to Mr. Gibson to support his advice.  However, in an examination under oath taken on March 9, 2010, Mr. Gibson stated that he deeded his interest in the Real Property to Mrs. Gibson for "medical" reasons, ostensibly relating to an accidental fall that occurred in 2003 resulting in severe personal injuries to Mr. Gibson.[12]  When asked at trial to explain how this injury related to the execution of the Quitclaim Deed, Mr. Gibson was unable to do so.  At trial, Mr. Gibson admitted that the possibility that the Websters would place a lien upon the Real Property was "in the back of [his] mind" when he executed the Quitclaim Deed.  He later tried to distance himself from this

---

[10] *Plaintiffs' Ex. 17.*

[11] Mr. Gibson so testified in his Rule 2004 examination.  *See Plaintiffs' Ex. 3-7.*  The proof of claim filed by the Websters on January 19, 2011, is consistent with this testimony.  *See Case No. 09-12646-M, Claim No. 2-1.*

[12] *Plaintiffs' Ex. 3-45* at lines 7 through 9.  At trial, Mr. Gibson testified that he changed this answer to include "advice of attorney" after he had read the examination.  However, he failed to produce at trial any documentation relating to the alleged change.  The Court gives Mr. Gibson's statements in this regard no weight.

testimony, again stating that he executed the Quitclaim Deed solely upon the advice of Hough. Hough did not testify at the trial of this adversary proceeding.

At the trial of this adversary proceeding, Mr. Gibson expressed his dissatisfaction with the representation provided by Stoops in the Webster Arbitration. Richard Warzynski ("Warzynski"), an Oklahoma attorney retained by Mr. Gibson on several matters, testified to his belief that Mr. Gibson had a viable legal malpractice claim against Stoops arising out of the Webster Arbitration and that the claim had value. Warzynski testified that he informed Mr. Gibson of the potential malpractice claim against Stoops in the spring of 2009. The Court finds this testimony to be credible.

The other key series of events in this adversary proceeding relate to Mr. Gibson's business of training dogs. At all times relevant hereto, Mr. Gibson has been the sole officer, director, and shareholder of Bob Gibson Training Kennels, Inc. ("BGTKI"), an Oklahoma corporation. BGTKI is engaged in the business of training dogs, including guard dogs and protection animals. The business activities of BGTKI were at all times relevant hereto conducted upon the Real Property. In the ordinary course of business, BGTKI and Mr. Gibson trained a dog (the "Dog") owned by Gary and Vicki Keeling (the "Keelings"). The training took place in 2006 and 2007. Under the terms of the contract between BGTKI and the Keelings, the Keelings agreed to hold BGTKI "and its employees, officers, directors, or employees [sic] as well as any ground or property owners used for training, harmless for loss or injury which may have allegedly been caused directly or indirectly to any person or thing by me and/or any act of my dog(s)."[13] It is alleged that in September of 2007, after the Dog had been returned to the Keelings, the Dog attacked the child of Eric Edwards and

---

[13] *Plaintiffs' Ex. 9-3*.

Shayla Edwards (the "Edwards"), resulting in severe physical and emotional damage to the child.[14] Mr. Gibson knew about the dog bite incident no later than September 20, 2007.[15] On April 24, 2009, the Edwards, as guardians for their child, filed an action against Mr. Gibson, BGTKI, the Keelings, and others, in the District Court of Garfield County, Oklahoma, seeking monetary damages as a result of the dog bite incident (the "Dog Bite Lawsuit"). The Dog Bite Lawsuit remains pending.

After being served with the Dog Bite Lawsuit, Mr. Gibson and his counsel took two significant steps. In a letter dated June 18, 2009, Warzynski informed the Edwards that he had put counsel for the Keelings "on demand to defend the training kennels" in the Dog Bite Lawsuit on the basis of the contracts between BGTKI and the Keelings.[16] In addition, Mr. Gibson, relying upon the terms of his homeowner's policy, contacted State Farm Insurance Company ("State Farm") and demanded that State Farm defend him in the Dog Bite Lawsuit. Mr. Gibson obtained his homeowner's insurance policy from his brother, "Blackie" Gibson, a State Farm agent, in 1994. State Farm initially provided Mr. Gibson with counsel, while reserving its right to review the matter and make a determination as to whether the homeowner's policy required State Farm to provide coverage for the Dog Bite Lawsuit. State Farm ultimately determined that it was not obligated to provide coverage for the Dog Bite Lawsuit, and so informed Mr. Gibson in a letter dated August 11,

---

[14] The Court is making no findings at this time regarding the merits of the claims advanced by the Edwards.

[15] The Court bases this conclusion upon documents included in Plaintiffs' Exhibit 9, which is a June 18, 2009, letter from Warzynski to Eric Edwards enclosing copies of all of the records of BGTKI relating to the Dog. Included in those documents is a copy of an "Order for Quarantine" dated September 19, 2007, stating that an individual had been bitten by the Dog, and a September 20, 2007, facsimile from BGTKI to "Mr. Chambers and the Keelings," advising that the Dog had been euthanized.

[16] *Plaintiffs' Ex. 9-1*.

6

2009.[17] Mr. Gibson also sought coverage from State Farm under the terms of the Keelings' homeowners' policy with State Farm. State Farm also denied coverage under that policy.[18] On August 27, 2009, Holly D. Shull, the attorney hired by State Farm on behalf of Mr. Gibson in the Dog Bite Lawsuit, filed her motion to withdraw as counsel.[19] The motion was granted on August 28, 2009.[20] Warzynski then assumed representation of BGTKI in the Dog Bite Lawsuit.[21]

After State Farm informed Mr. Gibson that it would not provide him with coverage in the Dog Bite Lawsuit, Mr. Gibson and Warzynski discussed whether Mr. Gibson had a claim against his brother, Blackie Gibson, for failure to procure proper and sufficient insurance. A determination was made that such a claim may well exist, and Warzynski informed Mr. Gibson of the potential claim in August of 2009. According to Warzynski, there is "no doubt" that Mr. Gibson knew he had a potential claim against Blackie Gibson prior to the time he filed his bankruptcy petition. According to Warzynski, the claim against Blackie Gibson has a potential value in excess of $2,000,000.

Mr. Gibson was involved in other litigation. On June 11, 2008, Mr. Gibson and Mrs. Gibson, acting *pro se*, filed an action in the District Court of Tulsa County, Oklahoma against Explorer Pipeline Company, Explorer Pipeline Glenpool Facilities Company, and Explorer Pipeline Services

---

[17] *Plaintiffs' Ex. 1-2.*

[18] *Plaintiffs' Ex. 1-6.*

[19] *Defendant's Ex. 3.*

[20] *Defendant's Ex. 4.*

[21] Warzynski unequivocally testified that he only represented BGTKI in the Dog Bite Lawsuit. However, the records of the Garfield County District Court show Warzynski as counsel for both Mr. Gibson and BGTKI. *See Defendant's Ex. 2-2.*

Company (collectively "Explorer"), alleging damage to the Real Property and personal injuries as a result of the activities of Explorer (the "Nuisance Lawsuit"). On April 23, 2009, Warzynski entered his appearance in the Nuisance Lawsuit on behalf of Mr. and Mrs. Gibson. The Nuisance Lawsuit was dismissed without prejudice on March 23, 2010, ostensibly because Mr. and Mrs. Gibson did not have the economic wherewithal to fund it. According to Warzynski, the Nuisance Lawsuit has some value. Warzynski testified that he would consider a settlement in the range of $50,000 to $100,000 to be a favorable result in the Nuisance Lawsuit.

Mr. Gibson filed an original petition for relief under Chapter 7 of the Bankruptcy Code on August 27, 2009 (the "Bankruptcy Case"). Hough filed the Bankruptcy Case for Mr. Gibson. Scott P. Kirtley ("Kirtley" or "Trustee") was appointed to serve as trustee in the case. Mr. Gibson listed the Real Property in his schedules, claimed it as exempt, and disclosed the March 19, 2009, transfer of his interest in the Real Property to Mrs. Gibson. He also listed the Dog Bite Lawsuit and the Nuisance Lawsuit in his statement of financial affairs. Mr. Gibson listed no other litigation in his bankruptcy schedules or statement of affairs, nor did he list any "contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims" in his schedules of assets. Specifically, the schedules and statement of financial affairs contain no mention of any potential malpractice claim against Stoops, any claim against State Farm for failure to defend Mr. Gibson in the Dog Bite Lawsuit, or any claim against Blackie Gibson for failure to procure proper and sufficient business insurance for Mr. Gibson and/or BGTKI. Neither the schedules nor the statement of financial affairs have been amended to include any such claims or potential assets. Kirtley learned of the existence of the potential claims against State Farm and Blackie Gibson when told of the same by Eric Edwards prior to the first meeting of creditors.

Kirtley learned of the potential malpractice claim against Stoops at the trial of this adversary proceeding. Kirtley considers these assets to be property of the bankruptcy estate.

Kirtley and the Websters objected to the Debtor's claim of homestead exemption in the Real Property, relying in part upon the fact that Mr. Gibson had conveyed his interest in the Real Property to Mrs. Gibson prior to the filing of the Bankruptcy Case. The Court sustained the objection and denied the claim of exemption. The order denying the exemption claim is now final. Some time thereafter, Kirtley sued Mrs. Gibson to recover as a fraudulent conveyance the undivided one-half interest in the Real Property conveyed by Mr. Gibson pursuant to the Quitclaim Deed.[22] On November 1, 2010, the Court entered an order approving a settlement between Kirtley and Mrs. Gibson. Under the terms of the settlement, Mrs. Gibson paid Kirtley the sum of $33,750 in exchange for a release of any claims the bankruptcy estate may have held in the Real Property.[23] These monies remain in the Debtor's bankruptcy estate.

On June 24, 2010, over nine months after the Bankruptcy Case was filed, Mr. Gibson and BGTKI filed an action against State Farm in the District Court of Tulsa County (the "State Farm Lawsuit"), alleging that State Farm was obligated to provide coverage for BGTKI and Mr. Gibson in the Dog Bite Lawsuit and that State Farm acted in bad faith as it failed to do so. Warzynski is counsel of record for both BGTKI and Mr. Gibson in the State Farm Lawsuit. Mr. Gibson did not seek leave of the bankruptcy court to file the State Farm Lawsuit. In the State Farm Lawsuit, Mr. Gibson specifically alleges that State Farm breached its insurance contract with Mr. Gibson on

---

[22] *Adv. Proc. 10-1037-M.*

[23] *Id.,* Docket No. 21.

August 17, 2009, a date well prior to the filing of the bankruptcy petition.[24] Mr. Gibson seeks damages against State Farm in an amount in excess of $75,000, plus punitive damages and attorneys' fees. Warzynski testified that in August of 2009, he believed that the State Farm Lawsuit could be worth in excess of $2,000,000. State Farm caused the State Farm Lawsuit to be removed to the United States District Court for the Northern District of Oklahoma (the "USDC"). Recently, the USDC entered an order granting summary judgment in favor of State Farm on the bad faith claims. The claim against State Farm for failure to provide coverage remains pending. Kirtley was told by Mr. Gibson's prior bankruptcy counsel, Paul Tom, that the basis for the State Farm Lawsuit came into existence after the Bankruptcy Case was filed.[25]

The Nuisance Lawsuit against Explorer was recently refiled by Mr. and Mrs. Gibson, utilizing new counsel. Mr. Gibson did not obtain permission of either the bankruptcy court or the Trustee to recommence the Nuisance Lawsuit, nor did he seek to have the Nuisance Lawsuit abandoned from the bankruptcy estate. Mr. Gibson testified that he caused the Nuisance Lawsuit to be refiled because the statute of limitations was about to run with respect to the cause of action, the Trustee had taken no action in that regard, and new counsel had agreed to advance all expenses related to the case.

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

---

[24] *Plaintiffs' Ex. 6–4 through 6–6.* Warzynski testified that, in his opinion, the claim accrued on August 11, 2009, the date State Farm issued its letter denying coverage for the Dog Bite Lawsuit.

[25] The timing of the accrual of the cause of action set forth in the State Farm Lawsuit is important, as causes of action that come into existence after the filing of a bankruptcy case may not constitute property of the bankruptcy estate.

**Conclusions of Law**

The Edwards contend that Mr. Gibson should be denied a discharge in this bankruptcy case for two reasons. First, they contend that Mr. Gibson executed the Quitclaim Deed with the intent to hinder, delay, or defraud his creditors, including the Edwards. The Edwards also argue that Mr. Gibson intentionally failed to fully disclose all of his assets in his bankruptcy schedules and statement of affairs under penalty of perjury. The Court will examine each argument in turn.

*Section 727(a)(2)*

Section 727(a)(2) of the Bankruptcy Code provides that

[t]he court shall grant the debtor a discharge, unless--

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--
>
> > (A) property of the debtor, within one year before the date of the filing of the petition; or
> >
> > (B) property of the estate, after the date of the filing of the petition[.][26]

As one court has noted,

> To sustain an objection under § 727(a)(2), an objecting party must prove: (1) That the act complained of was done at a time subsequent to one year before the date of the filing of the petition; (2) With intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code; (3) That the act was that of the debtor or his duly authorized agent; and (4) That the act consisted of transferring, removing, destroying or concealing any of the debtor's

---

[26] § 727(a)(2).

11

property, or permitting any of these acts to be done.[27]

Three of these elements are easily satisfied in this case. Prior to the transfer, Mr. Gibson held an interest in the Real Property as a joint tenant with rights of survivorship. That interest was transferred to Mrs. Gibson when he executed the Quitclaim Deed. The transfer took place within one year of the date Mr. Gibson filed his petition for bankruptcy relief. The remaining question is whether the transfer was made by Mr. Gibson with the intent to hinder, delay, or defraud a creditor.

In determining whether a transfer was made with the intent to hinder, delay, or defraud a creditor, direct evidence is seldom found. Those who engage in fraudulent conduct rarely admit their guilt. As a result, courts look to various "badges of fraud" in order to determine whether a debtor acted with the requisite intent:

> Although the Tenth Circuit has not set forth any specific list of "badges of fraud," these badges normally include the following: "(1) lack or inadequacy of consideration for transfer; (2) existence of a family, friendship, or special relationship between parties; (3) attempt by debtor to keep transfer secret; (4) financial condition of the party sought to be charged both before and after transaction; (5) existence or cumulative effect of pattern or series of transactions or course of conduct after incurrence of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) overall chronology of events and transactions." In appropriate circumstances, some courts have also considered as badges of fraud: (1) the retention of possession, benefit, or use of the property in question; (2) a purported transfer of all or substantially all of the debtor's property; and (3) the instrument affecting the transfer suspiciously stating that it is in fact bona fide. "One of these factors may be sufficient to find actual fraudulent intent; an accumulation of several such factors strongly indicates that the debtor possessed the requisite intent."[28]

As the United States Court of Appeals for the Tenth Circuit has noted, "[t]he cases [under §

---

[27] *In re Stewart*, 421 B.R. 603 (Table), 2009 WL 3724977 at *2 (10th Cir. BAP 2009) (citations omitted).

[28] *Freelife Int'l, LLC v. Butler (In re Butler)*, 377 B.R. 895, 916-17 (Bankr. D. Utah 2006) (footnotes omitted).

727(a)(2)], however, are peculiarly fact specific, and the activity in each situation must be viewed individually."[29] Some courts have held that "actual intent to hinder or delay a creditor can be negated by reliance on the advice of counsel."[30] The debtor must rely in good faith upon the advice,[31] and "a finding that the debtor knew that the purpose of the transfers was to hinder or delay a creditor is inconsistent with good faith and precludes the debtor's assertion of this defense even where he is otherwise innocent of any improper purpose."[32]

Several badges of fraud are present in this case. The transfer of an interest in the Real Property was from Mr. Gibson to his wife. No consideration was given in exchange for the Quitclaim Deed. The Quitclaim Deed was executed seven days after an order was entered in the Webster Arbitration holding Mr. Gibson personally liable for the award of $192,800. Mr. Gibson admitted, albeit somewhat begrudgingly, that the possibility that the Websters could file a judgment lien against the Real Property was "in the back of [his] mind" when he executed the Quitclaim Deed. He has retained full beneficial use of the Real Property, both as a personal residence and as a location for the business operations of BGTKI. Against these badges of fraud we have the testimony of Mr. Gibson, who states that he executed the Quitclaim Deed upon advice of counsel. He has offered no documentary or testimonial evidence to support his statements.

This Court finds that the badges of fraud support a finding that Mr. Gibson acted with the

---

[29] *Marine Midland Bus. Loans, Inc. v. Carey (In re Carey)*, 938 F.2d 1073, 1077 (10th Cir. 1991).

[30] *Cuervo v. Snell (In re Snell)*, 240 B.R. 728, 730 (Bankr. S.D. Ohio 1999) (citing *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir. 1986)).

[31] *Id.*

[32] *Id.* at 730–31.

intent to hinder, delay, or defraud his creditors, and outweigh Mr. Gibson's testimony. It is beyond dispute that Mr. Gibson executed the Quitclaim Deed less than one year prior to the filing of the Bankruptcy Case. It is beyond dispute that the Quitclaim Deed conveyed Mr. Gibson's interest in the Real Property to his wife. It is beyond dispute that Mr. Gibson retained full access to and the benefits of use of the Real Property after the conveyance. It is beyond dispute that Mr. Gibson was facing severe financial loss at the time of the conveyance: namely, the adverse ruling in the Webster Arbitration, which left him (and his property) exposed to liability in excess of $190,000. In the eyes of the Court, the alleged reliance upon the advice of Hough fails for two reasons: first of all, the Court does not find Mr. Gibson's testimony in this regard to be credible. If Mr. Gibson actually relied upon the advice of Hough, the Court is left to wonder why he made no mention of this at his 2004 examination in March of 2010.[33] Surely something so important would have been as deeply etched in Mr. Gibson's mind in March of 2010, as it seemed to be at the trial of this adversary proceeding in March of 2011. In addition, Mr. Gibson admitted that the possibility that the Websters could obtain a judgment lien against the Real Property was in the back of his mind when he executed the Quitclaim Deed. Where a debtor is aware that his conduct may serve to hinder or delay a

---

[33] As previously noted, the Court gives no weight to Mr. Gibson's testimony that he later amended his testimony in his 2004 exam. He did not offer the alleged amendments into evidence, and there is no real basis to presume that they exist. Moreover, when the 2004 examination was taken, an objection to Mr. Gibson's claim of the Real Property as his homestead was pending, and the 2004 examination was taken in furtherance of that objection. The answer given by Mr. Gibson at that examination makes no mention of any advice of counsel; indeed, the answer makes little or no sense. Even if Mr. Gibson, upon reflection, made such an amendment at a later date, the Court does not believe that a witness, upon questioning, would forget or overlook what he perceives to be his strongest defense. Moreover, Mr. Gibson's testimony that an attorney advised him to execute the Quitclaim Deed, without telling him why it would be a good idea, is hard to believe.

creditor, the defense of advice of counsel will not serve to protect him.[34]

The Court finds that all of the elements of § 727(a)(2)(A) have been satisfied. Mr. Gibson is not entitled to a discharge in this case. In order to assist any court that may be called upon to review this decision, the Court will consider the second ground for denial of discharge as well.

*Section 727(a)(4)(A)*

Section 727(a)(4)(A) of the Code provides that a discharge may be denied where the debtor "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."[35] The United States Court of Appeals for the First Circuit has held that

> the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.[36]

The Fourth Circuit has held that

> In order to be denied a discharge under this section [§727(a)(4)(A)], the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud. The false oath made by the debtor must have related to a material matter. Whether a debtor has made a false oath within the meaning of § 727(a)(4)(A) is a question of fact.[37]

---

[34] *Cuervo v. Snell (In re Snell)*, 240 B.R. 728, 730–31 (Bankr. S.D. Ohio 1999).

[35] § 727(a)(4)(A).

[36] *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987) (citations omitted).

[37] *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987) (citations omitted). *See also In re Brown*, 108 F.3d 1290, 1294 (10th Cir. 1997) ("In order to deny a debtor's discharge pursuant to this provision, a creditor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to

A statement contained in a debtor's schedules or statement of affairs, or the omission of assets from the same may constitute a false oath for purposes of § 727(a)(4)(A).[38] Because the debtor is usually the only person able to testify directly concerning intent, "fraudulent intent may be deduced from the facts and circumstances of a case."[39]  Moreover, "reckless indifference to the truth . . . has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A)."[40] At least one court has noted that "[w]here assets of some substantial value are omitted from the schedules, the conclusion that they were omitted purposefully with the fraudulent intent to conceal the assets in question may be warranted."[41]

The Edwards argue that the failure of Mr. Gibson to disclose the following assets constitutes a false oath for purposes of § 727(a)(4):

1. The malpractice claim against Stoops;

2. The claim against State Farm for failure to defend him in the Dog Bite Lawsuit under the terms of his homeowner's policy;

3. The claim against State Farm for failure to defend him in the Dog Bite Lawsuit under the terms of Keelings' homeowner's policy;

4. The claim against Blackie Gibson for failure to obtain proper insurance coverage;

5. The claim against the Keelings for indemnification with respect to the Dog Bite

---

a material fact.").

[38] *See In re Calder*, 907 F.2d 953, 955 (10th Cir. 1990).

[39] *Id.* at 955-956.

[40] *In re Tully,* 818 F.2d at 112 (internal quotes, citation and footnote omitted).

[41] *Crews v. Topping (In re Topping)*, 84 B.R. 840, 842 (Bankr. M.D. Fla. 1988) (citation omitted).

Lawsuit; and

6. The homeowner's liability policy issued by State Farm.

The Court has little concern with the failure to disclose the existence of the homeowner's insurance policy. In almost fourteen years on the bench, this judge has never seen a homeowner's insurance policy listed on the bankruptcy schedules. Such policies have no cash value and do not normally generate revenue; instead, they protect against loss. Prepetition claims against insurance policies, insurance agents, and other parties, however, are another matter. Claims of that nature constitute property of the bankruptcy estate.[42] They are to be disclosed in the bankruptcy schedules.[43]

The indemnity claim against the Keelings was known to Mr. Gibson at the time he filed his bankruptcy petition. It should have been scheduled. The same can be said for the claims relating to Blackie Gibson. Mr. Gibson's failure to schedule a claim against State Farm, coupled with his filing of the State Farm Lawsuit after the filing of his bankruptcy petition without informing Kirtley, is reckless at best, and could be considered a knowing attempt to defraud the bankruptcy estate at worst. We also have the malpractice claim against Stoops, which was never disclosed to the Trustee until he heard about it at trial. In addition, even though the existence of the Nuisance Lawsuit was disclosed in the statement of financial affairs, it was not listed as an asset. Throughout the entire duration of the Bankruptcy Case, Mr. Gibson has treated the Nuisance Lawsuit as if it belonged to

---

[42] *See* § 541(a)(1) ("The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held: (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.").

[43] *See U.S. Trustee v. Eppers (In re Eppers)*, 311 B.R. 826, 832 (Bankr. D.N.M. 2004) (and cases cited therein) ("Debtors have the duty to fully and accurately disclose all property interests on their statements and schedules.").

him, first by dismissing the case without prejudice, and then refiling it, all without the consent of the Trustee or the approval of the Court. With respect to the claims against State Farm, Blackie Gibson, and Stoops, counsel for Mr. Gibson testified without hesitation that he made Mr. Gibson aware of these claims prior to the filing of the Bankruptcy Case. These facts, when taken together, establish that Mr. Gibson has, at a minimum, acted with a reckless disregard for his duty to disclose all of his assets in his bankruptcy schedules. The facts also support a finding that Mr. Gibson failed to disclose the existence of these claims in order to keep them as his own. Either of these conclusions justifies the denial of his discharge under § 727(a)(4)(A).

## Conclusion

Debtor shall not be granted a discharge in this case. A separate judgment in accordance with this Memorandum Opinion is entered concurrently herewith.

Dated this 5th day of April, 2011.

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

6091.4